J-S82020-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
JEROME BANKS :
:
Appellant : No. 409 WDA 2017

Appeal from the Judgment of Sentence June 24, 2016
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0015870-2014

BEFORE: BENDER, P.J.E., STEVENS, P.J.E.,* and STRASSBURGER, J.**

MEMORANDUM BY STEVENS, P.J.E.: **FILED JANUARY 22, 2018**

Appellant Jerome Banks appeals from the judgment of sentence
entered in the Court of Common Pleas of Allegheny County after a jury
convicted Appellant of Robbery (Causing Serious Bodily Injury),[1] Burglary,[2]
Aggravated Assault,[3] and Criminal Conspiracy to commit the aforementioned
crimes.[4] After careful review, we affirm the judgment of sentence.

The trial court summarized the factual background of this case as
follows:

> On the morning of October 10, 2014, at approximately 8:30
> a.m., the victim, Anthony Matthews, was asleep in his bedroom

---

[1] 18 Pa.C.S.A. § 3701(a)(1).
[2] 18 Pa.C.S.A. § 3502(a)(1).
[3] 18 Pa.C.S.A. § 2702(a)(1).
[4] 18 Pa.C.S.A. § 903.

---

\* Former Justice specially assigned to the Superior Court.
\*\* Retired Senior Judge assigned to the Superior Court.

when he was suddenly awakened by three (3) African-American men standing at his bedside. The intruders had broken into his apartment at 100 Moore Avenue, located in the Knoxville/Mt. Oliver area of the city of Pittsburgh. All three (3) men were armed with weapons, and they made no attempt to mask their identities. Mr. Matthews was immediately able to recognize two (2) of the intruders as James and Jerome Banks, the younger brothers of his ex-girlfriend, London Banks. Mr. Matthews met [Appellant] in May of 2014, and he was well familiar with the Banks brothers. He knew exactly what the Banks brothers looked and sounded like because he had spent time with them during the time that he was dating their sister. James Banks knew exactly where Mr. Matthews lived because London Banks had briefly resided with Mr. Matthews during the time that they were dating, and James Banks had been inside of Mr. Matthews' apartment on at least one (1) prior occasion.

Mr. Matthews woke up to an unidentified man yelling "Where's the money[,] [w]here's the money?" Armed with a knife, the unidentified man was standing at the side of Mr. Matthews' bed, and he stabbed Mr. Matthews in the abdomen as Mr. Matthews was attempting to stand up in order to get out of bed. Mr. Matthews began fighting with the unidentified man, and, with his right hand, Mr. Matthews grabbed the knife that the man was holding. During the struggle, Mr. Matthews felt himself stabbed again, this time in the back. When he turned around, he realized that James Banks was also armed with a knife and that James Banks had been the one who had stabbed him in the back.

As Mr. Matthews tried to push James Banks away from him, the unidentified man stabbed him again, this time in the side. Mr. Matthews turned back around to grab the knife from the unidentified man, and, as he continued to struggle for the knife, [Appellant] began hitting Mr. Matthews repeatedly in the head with a brick, delivering between six (6) and seven (7) blows. Mr. Matthews heard James Banks yell to [Appellant], "hit him, hit him, hit him." Shortly thereafter, [Appellant] and his brother ran out of the bedroom, leaving Mr. Matthews alone with the unidentified male. At that point, Mr. Matthews, who still had a grip on the unidentified male's knife, released his grip from the knife, which allowed the man to flee from the apartment. Before leaving the apartment, however, the three (3) men stole Mr. Matthews' Playstation 3 gaming system and laptop from his

living room, and they smashed his television with the same brick that [Appellant] had used to repeatedly hit him in the head.

After the third male ran out of the bedroom, Mr. Matthews stumbled out into his living room, screaming, "I don't have anything, I swear to God I don't have any money, I don't have anything for you all to take." Mr. Matthews collapsed on the floor of his living room. However, he managed to call 911 on his cell phone. Mr. Matthews then crawled across his living room floor and out into the hallway of his apartment building. His next-door neighbor, Donald Fuller, heard the struggle take place. Mr. Fuller had seen three (3) black men fleeing from Mr. Matthews' apartment when he peered through his peephole after he had heard the commotion outside.

Law enforcement officials were dispatched to the scene at approximately 8:56 a.m. Officers and medical personnel arrived within minutes and found Mr. Matthews in the hallway outside of his apartment, laying in a large pool of his own blood. Mr. Matthews was bleeding profusely, and he was fading in and out of consciousness due to the amount of blood loss that he had sustained. Mr. Matthews was in substantial pain to the "multiple severe stab wounds" that he suffered. His intestines were hanging out of his body, and he was struggling to breathe because of a stab wound to his lung. Mr. Matthews was transported to Mercy Hospital. While he was in route to the hospital, Mr. Matthews began panicking, believing that he was going to die, and he attempted to provide paramedic Shawn Eigenbrode with information about the attack. Although he was struggling to breathe through an oxygen mask, Mr. Matthews asked Mr. Eigenbrode to tell his mother, father, and daughter, if he did not survive, that he loved them. Mr. Matthews also relayed to Mr. Eigenbrode that he had been stabbed by his ex-girlfriend's brothers and that there were three (3) men who attacked him. When Mr. Eigenbrode asked the name of his ex-girlfriend, Mr. Matthews replied, "London Banks."

Upon his arrival at Mercy Hospital, Mr. Matthews was put into a medically-induced coma for approximately two (2) days. For about the next week, Mr. Matthews remained at the hospital, undergoing various surgeries and treatment. On October 17, 2014, Mr. Matthews' condition stabilized enough that he was able to speak with the police about the attack and stabbing. Mr. Matthews spoke with Detective Judd Emery, identifying his

attackers as Jerome and James Banks, the younger brothers of his ex-girlfriend, London Banks. Mr. Matthews was presented with separate photo arrays for each brother, and he positively identified both brothers without any hesitation. He circled their pictures, wrote their nicknames next to their faces, and signed his name.

After spending approximately a week in the hospital, Mr. Matthews was discharged. Unfortunately, he was readmitted less than 48 hours after discharge due to various complications from his injuries. Mr. Matthews required more surgical procedures, and he developed deep vein thrombosis. He spent nearly a month in the hospital during his second admission due to the complications he developed from his stab wounds. Mr. Matthews was ultimately discharged from the hospital on November 6, 2014. By the time of trial, Mr. Matthews still was experiencing symptoms from nerve damages in both of his hands and in his lower back. He continued to struggle with pain in his abdominal area from the scar tissue that had developed after his surgeries. He reported some slight short-term memory loss from the head injury that had been caused by the blows from the brick wielded by [Appellant]. In addition to his physical injuries, Mr. Matthews struggled with anxiety and post-traumatic stress, and he reported difficulty sleeping since the attack in his bedroom.

Prior to the attack, Mr. Matthews had been working full-time at the Chipotle Mexican Grill. He primarily worked on the grill and was also training for a management position at the restaurant. Since the stabbing, however, Mr. Matthews has not been able to work in any capacity because he is significantly limited in his ability to use his hands for an extended period of time. It is also difficult for him to work in any position that requires lifting or squatting because of the scar tissue in his stomach and the nerve damage in his back. Mr. Matthews also has difficulty sitting and standing for prolonged periods of time because he experiences severe, sharp pains in his back that shoot down his leg. Mr. Matthews is unsure whether he will be able to work a full workday again.

Trial Court Opinion (T.C.O.), 6/13/17, at 3-8 (citations omitted).

Following the grant of a mistrial on December 3, 2015, Appellant was retried before a jury in April 2016. At the conclusion of the trial, the jury convicted Appellant of robbery, burglary, aggravated assault, and criminal conspiracy to commit robbery, burglary, and aggravated assault. The jury acquitted Appellant of attempted murder. On June 24, 2016, the trial court sentenced Appellant to ten to twenty years' imprisonment for the robbery conviction and a consecutive term of ten to twenty years' imprisonment for aggravated assault. In addition, the trial court imposed a concurrent term of seven to fourteen years' imprisonment and five years' probation for the burglary conviction and a concurrent term of ten to twenty years' imprisonment for conspiracy to commit robbery. Appellant did not file a notice of appeal.

Three months later, defense counsel filed a motion to withdraw, which the trial court granted. After new counsel was appointed, Appellant filed a petition pursuant to the Post Conviction Relief Act (PCRA) seeking that his right to file a post-sentence motion and a notice of appeal be reinstated. On December 12, 2016, the lower court reinstated Appellant's post-sentence and appellate rights. Thereafter, Appellant filed a post-sentence motion which the lower court denied. Appellant filed this timely appeal.

Appellant raises one issue for our review:

> Did the trial court abuse its discretion at sentencing when it failed to adequately consider the sentencing guidelines and any relevant mitigating factors before imposing a sentence based solely on the nature and circumstances of the crime[?]

- 5 -

Appellant's Brief, at 6.

We begin by noting that it is well-established that "[a] challenge to the discretionary aspects of sentencing does not entitle an appellant to review as of right." *Commonwealth v. Bynum-Hamilton*, 135 A.3d 179, 184 (Pa.Super. 2016). To invoke this Court's jurisdiction to address such a challenge, the appellant must satisfy the following four-part test: the appellant must (1) file a timely notice of appeal pursuant to Pa.R.A.P. 902, 903; (2) preserve the issues at sentencing or in a timely post-sentence motion pursuant to Pa.R.Crim.P. 720; (3) ensure that the appellant's brief does not have a fatal defect as set forth in Pa.R.A.P. 2119(f); and (4) set forth a substantial question that the sentence appealed from is not appropriate under the Sentencing Code under 42 Pa.C.S.A. § 9781(b). *Id*. Appellant filed a timely appeal, preserved his sentencing claim in a timely post-sentence motion, and submitted a Rule 2119(f) statement in his appellate brief.

We may now determine whether Appellant has raised a substantial question for our review. "The determination of what constitutes a substantial question must be evaluated on a case-by-case basis." *Commonwealth v. Caldwell*, 117 A.3d 763, 768 (Pa.Super. 2015). This Court has provided that "[a] substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing

Code; or (2) contrary to the fundamental norms which underlie the sentencing process."

Appellant asserts that the trial court imposed the sentence in this case without adequate consideration of relevant mitigating factors and improperly focused solely on the gravity of the offenses. "This Court has held on numerous occasions that a claim of inadequate consideration of mitigating factors does not raise a substantial question for our review." *Commonwealth v. Miklos*, 159 A.3d 962, 970 (Pa.Super. 2017) (quoting *Commonwealth v. Disalvo*, 70 A.3d 900, 903 (Pa.Super. 2013)). However, this Court has provided that "an averment that the court sentenced based solely on the seriousness of the offense and failed to consider all relevant factors raises a substantial question." *Commonwealth v. Bricker*, 41 A.3d 872, 875 (Pa.Super. 2012) (quoting *Commonwealth v. Macias*, 968 A.2d 773, 776 (Pa.Super. 2009).

In reviewing a challenge to the discretionary aspects of sentence, we emphasize that:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Gonzalez*, 109 A.3d 711, 731 (Pa.Super. 2015) (quotation omitted).

Section 9721 of the Sentencing Code outlines general principles for the trial court to follow in fashioning a sentence, providing that "the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S.A. § 9721.  Moreover,

> Section 9781(c) specifically defines three instances in which the appellate courts should vacate a sentence and remand: (1) the sentencing court applied the guidelines erroneously; (2) the sentence falls within the guidelines, but is "clearly unreasonable" based on the circumstances of the case; and (3) the sentence falls outside of the guidelines and is "unreasonable." 42 Pa.C.S. § 9781(c). Under 42 Pa.C.S. § 9781(d), the appellate courts must review the record and consider the nature and circumstances of the offense, the sentencing court's observations of the defendant, the findings that formed the basis of the sentence, and the sentencing guidelines. The ... weighing of factors under 42 Pa.C.S. § 9721(b) [is] exclusively for the sentencing court, and an appellate court could not substitute its own weighing of those factors. The primary consideration, therefore, is whether the court imposed an individualized sentence, and whether the sentence was nonetheless unreasonable for sentences falling outside the guidelines, or clearly unreasonable for sentences falling within the guidelines, pursuant to 42 Pa.C.S. § 9781(c).

*Bricker,* 41 A.3d at 875–76 (Pa.Super. 2012) (citing *Commonwealth v. Bowen*, 975 A.2d 1120, 1123–1124 (Pa.Super. 2009)).

As noted above, Appellant received two consecutive sentences of ten to twenty years' imprisonment for his convictions for robbery (causing serious bodily injury) and aggravated assault as well as concurrent sentences for his burglary and conspiracy convictions.  As Appellant's prior

record score rendered him a repeat felony offender (RFEL) pursuant to 204 Pa.Code § 303.4 and the trial court applied the Deadly Weapon (Used) Enhancement set forth in 204 Pa.Code § 303.10(a)(1)(iii), Appellant's consecutive terms of ten to twenty years' imprisonment were standard range sentences.[5]

At the sentencing hearing, the lower court assured Appellant that he had twice reviewed the presentence report, which set forth mitigating factors and discussed Appellant's rehabilitative needs. We observe that:

> [w]here the sentencing court had the benefit of a presentence investigation report ("PSI"), we can assume the sentencing court was aware of the relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors. Further, where a sentence is within the standard range of the guidelines, Pennsylvania law views the sentence as appropriate under the Sentencing Code.

*Commonwealth v. Griffin*, 65 A.3d 932, 937 (Pa.Super. 2013) (citations and internal quotation marks omitted).

---

[5] Given that Appellant's prior record score (PRS) was RFEL and his conviction of robbery (causing serious bodily injury) carried an offense gravity score (OGS) of 12, the guidelines provided a standard range of 114 to 132 months. For Appellant's aggravated assault conviction that carried an OGS of 11, the guidelines provided for a standard range of 102-120 months. *See* 204 Pa.Code § 303.17(b).

We also note that the lower court was familiar with Appellant's criminal history as it had previously imposed Appellant's probation in prior cases.[6] Although defense counsel asserts that the lower court did not address Appellant's age and his "lack of prior convictions as an adult," the trial court rejected this argument, pointing out that Appellant was convicted as a juvenile for an offense in which he beat a female's head with a handgun and had already achieved the classification of a repeat felony offender (RFEL) at the age of twenty-three. *See* Appellant's Brief, at 26; Notes of Testimony (N.T.), Sentencing, 6/24/16, at 4. The trial court observed that Appellant's "prior, more lenient sentences for his past criminal conduct clearly failed to deter him from committing more crimes. His crimes escalated in seriousness throughout the years, and his demonstrated failure to be deterred from criminal activity makes him a danger to society." T.C.O. at 24.

The lower court's standard range sentences imposed for his violent robbery and assault of the victim were in no way an abuse of discretion. The lower court was well aware of the violent circumstances of this case in which Appellant and his co-defendants committed a home invasion in which they awoke the sleeping victim, demanded money, and repeatedly stabbed

---

[6] Appellant's convictions in this case served as grounds for the lower court to revoke his probation and resentence him in two prior cases involving convictions for weapons charges and receiving stolen property.

the victim. While the victim was already severely wounded and was struggling to defend himself, Appellant repeatedly hit the victim in the head with a brick.

Although Appellant apologized to the victim at the sentencing hearing, the lower court criticized Appellant's characterization of the attack as a "bad decision":

> [Appellant], I am sure the victim appreciates hearing some apology from you. I think it perhaps comes a bit late. There is no doubt that during the trial and mistrial that occurred before[,] the attitude that I got from you and your brother was certainly anything but apologetic. It was quite frankly arrogant and it was inappropriate a lot of times and certainly indicated no remorse. Perhaps having been convicted and facing substantial time in the state prison system you have now come to realize what you have done was wrong. This isn't just a poor decision. This isn't just a bad decision. I mean you don't do this kind of vicious, horrible attack, you know, because it was a bad decision like you picked the wrong pack of gum in the morning, you picked out the wrong socks or wrong color pants. Those are bad decisions. This is well beyond that.
>
> This is a horrible crime that you have committed where you almost killed a man, an innocent man who did nothing. He was going to and from work every day, staying off the streets, staying out of trouble, not causing issues. And to violate his home, a place where he should feel safe – he's not just in his home, but in his bedroom, a place where he should feel safe laying his head on a pillow every night, having good dreams about the better life he's creating for himself by hard work. Instead you have taken that from him. Taking his Play Station, you know, big deal. What you took from him was his ability to ever trust people and feel secure. And that's something that is not going to come back to him any time soon. That's something he's going to live with, my guess is for most if not all of his life.
>
> So you will certainly serve a sentence but at some point you will be free of that sentence, you will be out on the streets again. [The victim], however, is going to serve that sentence forever.

It's not going to stop with him. Every time he goes into his bedroom to lay down he's going to worry about is it going to be the alarm clock waking him up or is it going to be a knife in his side, is it going to be a brick to his head, is it going to be people screaming at him for something he doesn't even know what it is. That's what you have sentenced him to.

So perhaps we see the beginnings of remorse here because you have apologized, but you have a much farther way to go. My hope is that throughout your sentence you will continue to improve yourself so at some point maybe through your own actions you can make amends for what you have done. But it's going to take an awful long time for you to do that, sir, because of the damage you have caused.

N.T. at 22-24.

Accordingly, the record clearly shows that the lower court properly exercised its discretion and considered all the relevant sentencing factors in determining the appropriate sentence. *See Commonwealth v. Mouzon*, 828 A.2d 1126, 1128 (Pa. Super. 2003) (An "appellate court must give great weight to the sentencing court's discretion, as he or she is in the best position to measure factors such as the nature of the crime, the defendant's character, and the defendant's display of remorse, defiance, or indifference"). Therefore, Appellant's challenge to the discretionary aspects of his sentence is meritless.

Judgment of sentence affirmed.

Judgment Entered.

- 12 -

Joseph D. Seletyn, Esq.
Prothonotary


Date:  1/22/2018